You may proceed. Good morning. May it please the Court, Scott Crowell on behalf of the Iipay Nation and the related tribal officials and tribal entities. I would like to reserve five minutes for a rebuttal. Nothing in the Indian Gaming Regulatory Act, or IGRA, expressly requires that the patron physically be present on Indian lands for the game being conducted on Indian lands to be legal. Judge Battaglia erred in rewriting IGRA to contain that express requirement, and the United States is here today seeking affirmance. That's not quite right. The United States has formally approved Indian gaming where the patron uses the phone to call in his bet. The United States has formally approved Indian gaming where a proxy for the patron is on Indian lands. So we presume that they're seeking affirmance only as to the result. This unexplained contradiction in the actions of the United States reinforces Iipay's position on two of the subsequent legal questions at issue in this appeal. First, UIGA cannot be used to render an otherwise legal gaming activity illegal. And second, Judge Battaglia erred in finding that IGRA's restriction that gaming be conducted on Indian lands unambiguously requires the patron to be physically present on Indian lands at the time the game is being conducted. Pardon me, Mr. Crowell. Let's take your two statements. You say that there's already been decisions that phone calls made off Indian land do not violate the act. There's already been formal federal actions taken that approve. You're talking about AT&T? We're talking both about AT&T and the 1995 determination by the National Indian Gaming Commission regarding a proposal by Multimedia Games that both approved phone betting and approved the use of proxy play. And were those before the, I don't know, these acronyms, EGA, I'll just call it the Internet Gambling Statute. Those occurred before that statute? Yes, they did. And I'd be interested in your thoughts because it seems to me there's some significance in the timing of these statutes. You have IGRA, which is out there, passed way back, 1988. And then, of course, we have quite a technology change, and we have the whole impact of the Internet on gambling. And so why are those necessarily dispositive when we now have some very specific rules on Internet gambling under the Internet statute? Well, for two reasons. One is in the passage of UIGA, they specifically prevented its use to render an otherwise legal gaming activity illegal. But secondly, Congress did envision that these types of advances in technology would occur in the future. In fact, you know, the language of the statute itself in defining Class 2 gaming specifically makes reference to the ability of tribes to be used, to be able to use electronic aids in the play of the Class 2 game of bingo, which is the only game at issue here. And in the underlying Senate report, they indicated they stated that the committee intends that tribes be given the opportunity to take advantage of modern methods of conducting Class 2 games, and the language regarding technology is designed to provide maximum flexibility. They went on to say it's the committee's intent that with the passage of this Act, no other Federal statute, such as those listed below, including the Wire Act, will preclude the use of otherwise legal devices used solely in the aid or in conjunction of bingo or lotto or such other games on or off Indian lands. And those are both from the Senate report accompanying the passage of UIGA. So although, although in 1988, I don't think anybody in this room would have had the idea that the Internet would be so pervasive on every aspect of modern life, but Congress did know that those technological changes were coming. And Congress specifically intended for tribes to be able to have maximum flexibility in being able to take advantage and use those technologies in the play of, specifically the play of the specifically defined game of bingo in the passage of the Act of 1988. So your position boils down to the fact that gambling, of course, is legal on tribal lands, but it's also legal in California anywhere you have access to the Internet, correct? I mean, wouldn't that really be the ultimate result of your position? That a person in California would be able to access an on-reservation game and be able to play that, be able to have that game played on his behalf, yes. Well, now we'll go to the behalf part. So if we're sitting here in the courtroom and we took the little disc that we were provided when we could sort of semi-play the game on that, and I have to input my amount and all those kind of things, your position is, well, it's not really taking place in California, even though I'm sitting in the courtroom. If I had true access through the Internet with all the decisions that had to be made, you're just saying the proxy person is doing that, not me in California. That's right. What you're doing when you're sitting at your terminal is both establishing an on-reservation account and authorizing an on-reservation proxy to play the game on your behalf. But that person isn't really playing the game on my behalf. I played the game here, or someone played the game. No, that person, that proxy is who's playing the game on your behalf. And how is that? But that seems to me to be, I don't want to be pejorative, but it seems to be a subterfuge or a smoke screen as to what's really happening. How is the proxy person playing the game? The Indian Gaming Regulatory Act specifically defines what constitutes the game of bingo. It's played for prizes, including monetary prizes, with cards bearing numbers or other designations, in which the holder of the card covers such numbers or designation when objects similarly numbered or designated are drawn or electronically determined, and three, in which the game is won by the first person covering the previously designated arrangements of numbers or designations to such cards. All three of those actions occur on IPEI Indian land. It's not really a person, is it? I mean, it's just a series of computers that does that. Well, as Congress envisioned, the tribe is taking maximum flexibility to be able to have those things being done in an electronic manner. But part of the process of establishing the accounts is the designation of an on-reservation agent on behalf of the player, and there are circumstances in which that game can be denied if the person shows up on the exclusion list of the Tribal Gaming Commission. That's an electronic exclusion? Not, no, no. As described there, how many people are generally there monitoring as the agent? One person? You have one person serving as the agent and other persons under his direction that monitor the proxies, at least as the facts of the initial startup operation that were involved. Of course, if we grew, then more individuals would likely be employed to be able to take on that responsibility. But that person does have the ability to stop the play for any one of a number of reasons. So sitting here in California, what are the actions that a player takes on his or her computer? The player pulls up the disk, acknowledges the critical aspects of the transaction, that it is occurring on Indian lands, that the patron is affirmatively consenting to the jurisdiction of the EPA nation, and that the game is being played pursuant to the IPA. But now what does the player do? So after that is done, then the player pulls up a page where he establishes an on-reservation account to where — With how much money, in other words? Well, or a fund of money. A fund of money. To be able to use by the proxy for the player's play. Correct. And then — and then he instructs the — his agent as to the number of cards and the price of the cards to be played in any particular game. It's really, in many respects, the same as California's advanced wager depositing program, where California is one of — one of a few States that dominate the Internet horse racing industry, where a person establishes an account with the ADW and instructs their agent at the ADW on how that account is to be used to be made on wagers on specific races, and then that agent or proxy at the ADW makes the wager on behalf of the — of the California resident, or actually, California laws allow a resident of any State that allows for interstate gaming to be able to play in those games. It's hard to — it's hard to imagine this idea of a proxy, if you forgive me, but it sounds — and I think it was maybe the district court that said the whole thing is a fiction to sidestep the requirements of the California statute outlawing bingo. Well, you know — A proxy, it's just a computer-created program, isn't it? Well, no, it's not. You know, it is a contractual action between — between the patron and the IPA nation to authorize that proxy to do certain things on behalf of — of the patron. And — and the contract law is very clear, and in fact, you even have, you know, the NIGC commission's approval making clear that — that when that proxy is acting on behalf of the patron, it's the — that agent and the actions of that agent that are on reservation that — that — that is the actual conduct of the game. The State statute says we are going to outlaw bingo. Is that fairly accurate? No. No. The State — California allows for bingo. And — and that — you know, and — and under the Indian Gaming Regulatory Act, if the — if the State permits that game for any person or organization or entity, then the tribe is entitled to play that game as Class II games. It's — it's citizens, the citizens of California. Citizens of California are able to play bingo, yes. Right. Anywhere. Anywhere in the State subject to State regulation on State lands and subject to tribal regulation on tribal lands. Thank you. I reserve the rest of my time. Yes. May it please the Court. My name is Glenn Dorgan. I'm an Assistant United States Attorney. I represent Apelli, the United States. I'm here with Bill Torngren, who is the Deputy Attorney General representing the State of California. Desert Rose Bingo is, by design, a gaming operation that seeks to collect revenues from off-site illegal gambling. As Judge Battaglia noted in his underlying decision, several facts are undisputed. It is undisputed that these patrons are not on Indian lands when they're engaging in the gaming operation. Maybe you can correct my mistake. Is gambling or bingo outlawed or not in California? Right. I was going to address that, Judge. California allows charitable bingo. That's what the statute allows. California, incidentally, requires for that charitable bingo that the patron be present. In this case, the patrons cannot be present. In fact, if they wanted to go on Indian lands to play this gaming, they'd be turned away insofar as there's no mechanism by which they can engage in the gaming on Indian lands. There are no terminals there. They must use their personal computers, their iPads, their phones, off Indian lands to engage in this gaming. That's undisputed. Let me ask you, I know that the casino, so to speak, is closed now, but let's say it opened up and it put in a couple of terminals. And I'm in California, and I call them up and say, I want to play bingo, or please, my friend who's on Indian land at that point, please execute these transactions for me. Would that be legal? In that regard, that's not a UGA issue insofar as it's a telephone call. The question is whether it's covered by IGRA. Correct. Is no, insofar as that's gambling activity that's occurring off Indian lands. It's an initiated telephone call. So what if I email my request to my friend who's on Indian land and say, I would like to play bingo, and the casino decides it's going to open up and put in some terminals. Would that be illegal under the IGRA? Well, and, Your Honor, that raises two issues. And initially, is the conduct itself illegal under California law? We haven't gone there insofar as whether an email soliciting a bet is, you know, it violates California law. The next issue is simply, it's not whether it's illegal under IGRA. It's whether it's covered by IGRA. It's whether or not IGRA provides a safe harbor to the tribe to engage in this activity without State regulation of the activity that's occurring off Indian lands. And in that instance, the email to the friend, that activity, is not covered by IGRA. It's gambling activity that is off Indian lands. And that's actually addressed in one of the NIGC decisions, National — let me get this right. I think it's National Indian Bingo that addresses — yes, from the appellants at page 18. It's November 2000. In that case, the gaming proponent said, we want to engage in this gaming, and we want people to be able to make bets or to engage a proxy either by telephone or email. They then withdrew the request, and NIGC commented specifically that had — if you're going to engage in this activity, this off-site emails or telephone calls, it's going to avoid our opinion as to whether this is protected by IGRA. And it's also going to expose the tribe to civil and criminal penalties because, quote, all gaming activity must take place on Indian lands as required by IGRA. So coming full circle to your question, Your Honor, it comes down to the fact that IGRA simply doesn't regulate that off-site activity, just as IGRA does not regulate the off-site activity at issue in this case, namely the act of the patron pulling up his computer, logging on, funding an account, selecting cards, and then pressing submit request, which automatically debits his account and puts him in a position where he or she has just wagered that. He or she has just put that money at risk on a game of chance. That's the gambling. But I have a proxy that's doing much of that for me. What's wrong with that? If I may address the proxy issue, Your Honor. And throughout the litigation of this case, the term proxy used by Desert Rose Bingo has taken on three different meanings, if you will. Not one of those meanings is the traditional sense of the individual who is on-site, who's engaged on-site to gamble for someone, and then actively engages in the gambling. Instead, you'll find, for example, that when you're a player and you're on the computer, let's say you submit your bet, you press submit request, and that bet is placed and your account is debited, you're now waiting for other patrons to join that game because you need a minimum number of patrons. There will be a message that says, waiting for other proxies. It's undisputed that in that instance the term proxy means other patrons. That's meaning one. Meaning two, they call the program operated by one of their servers the proxy player. That's the name of the program. In fact, the job description of David Shillett, the President, who operates this gaming, is to monitor the operation of the proxy player. And it's undisputed that's a reference to the computer itself. Kagan. Yes. Then that's reference number two. Then there's reference number three. And that's Mr. Shillett and the individuals who work with him who are occasionally called, well, they are called proxy monitors. But their job, Mr. Shillett's job and his proxy monitor's job is simply to be present and monitor, operate a help desk. They are not actively engaging in this game. Contrast that, if you will, with the three that I can think of NIGC decisions that address proxy. In every one of those cases, an individual is on Indian land when they engage the proxy. In every one of those cases, that proxy then actively engages in the game play. They don't simply sit back and let computers do it. So to answer your question, Your Honor, which I believe was is there a proxy here, the question is or the answer is no. There simply is not a proxy here. In fact, the only individual actively engaging in the gaming is the patron. They're the ones gambling. And that activity occurs off Indian lands, is not subject to IGRA, and is governed by UGIA and warrants the relief we're seeking here. So if all this had happened, if there was no UGIA. If there was no UGIA. Right. Then we wouldn't be in this situation. Well, I certainly wouldn't be here. Well, that's true. But I could envision in that scenario the state of California taking prosecutorial action against the patrons. Right. That might then lead to a similar issue being before this court. But that's how we present it. But so it's really the intervention of this new federal statute that changes the whole game. That authorizes my office, Your Honor, yes, to essentially enjoin gaming that involves the Internet, that is illegal at the point that the bet is initiated off Indian lands. Yes, Your Honor. If I may turn to a couple other brief issues. Counsel mentioned that the 1995 multimedia decision, the NIGGC decision, authorizes telephone access for gambling. I take issue with that respectfully. That is incidentally cited in the opening brief at page 26. If you need to find that, it's a July 26, 1995 decision. The game at issue there, quote, is a Class II game conducted on a daily basis with over 50 Indian tribes linked by closed-circuit telephone lines and satellite television. In other words, this is, of the number of games that are traditionally intra-tribal, the game is conducted on tribal lands and involves other tribal lands gaming and is linked. But this opinion doesn't stand for the proposition that you can call in and make a bet from off. So that's a tribal-to-tribal. That's intra-tribal. Intra-tribal. Which is specifically, of course, excluded under UGIA. I also want to address briefly the notion referenced in the reply brief that I understand is the first time the notion has been raised, and that's this, that some level of deference should be afforded SYGC, the tribal regulator, in determining where the gambling occurs. As I read the brief, it's my understanding that the argument is essentially that some sort of level of either Chevron or Skidmore deference should be afforded to SYGC in its decision that this gambling occurs on Indian lands. We take issue with that strenuously on a number of grounds. Incidentally, at the lower court level, SYGC did seek deference as it related to the classification of the game, and Judge Battaglia determined that, no, I'm not going to afford you that deference because there's nothing in IGRA that suggests that Congress intended to provide legislative authority, if you will, to a tribal entity. And the judge commented that it would turn essentially IGRA, the hierarchy, upside down if hundreds of tribes could essentially issue regulations that have the force of law effectively trumping the NIGC. The same is true here, but even to a greater degree, because what they're seeking to do, what they're asking for is deference as it relates to essentially a determination of what the law is. And, indeed, as the Court, I'm sure, well knows, Skidmore or Chevron deference isn't even appropriate if Congress has already spoken to the issue. And they have. You're claiming it wasn't ambiguous. It's our position that IGRA is not ambiguous. And that gaming that occurs, gaming activity, which we know from Bay Mills means the gambling, has to be on Indian lands in order for IGRA's scope to apply. I believe I've addressed the issues that have been raised. I'm happy to answer any questions if the Court has any. Thank you. I would thank you for your time. Thank you. A couple of technical points that I just want to correct is that the 2000 NIGC approval of National Indian or letter regarding National Indian bingo that said you can't use e-mail or Internet relied upon the district court decision in the Coeur d'Alene case, and that district court decision was vacated by this Court. And much of the same discussion that I think goes to this whether IGRA is ambiguous, because what the United States was arguing in the end before this Court, the AT&T, is, well, yes, the NIGC formally approved the management contract and formally approved the Coeur d'Alene gaming ordinance, but, gee, we really weren't looking at this, at this Indian lands, better on Indian lands question, and the district court said, you know, that was a necessary part of your approval, and those approvals were final, and therefore were vacating the district court's analysis that said that, oh, well, quite clearly Congress must have intended that the patron must be physically present on Indian land. Kennedy, that decision was made simply on a procedural finding that this was an APA-reviewable decision, and the APA decision had not been reviewed, correct? That's the the management contract question was right. The APA had never been a challenge. And Judge Gould disagreed with that in his dissent. Yes, he did. Yes, he did. But it was the dissent. The majority of the decision said, you know, you took that final agency action, and that constitutes approval of the gaming activity that was at issue. Similar to the type of deference that, you know, Glenn, you know, made issue of at the end of his argument, the deference afforded to the EPA gaming commission is deference that the NIGC gave to that gaming commission and the approval of the tribe's gaming ordinance. Again, never challenged, no APA challenge brought against the NIGC's approval of that ordinance. If we agree with you, what does that say about the current status of the law in California? I mean, doesn't it make the statute a dead letter except with regard to charities? No, quite the contrary. If the underlying gaming activity is in violation of the Indian Gaming Regulatory Act, UIGA would apply. You know, he made the statement that he wouldn't be here but for UIGA. And, you know, we think that's right. And UIGA expressly says you can't use UIGA to go after an act that would otherwise be lawful. UIGA did not make the use of the Internet illegal. If the underlying statute, IGRA provides for it or allows for it, then UIGA can't make that legal act illegal. And to say, well, it would be different, I would look to the State if it were phone or e-mail and only, well, you know, the State doesn't have any jurisdiction over Class II gaming. Only the United States does. And the United States would be able to bring enforcement action for gaming not performed in compliance with the Indian Gaming Regulatory Act. Thank you. So this UIGA is not a means for which to go after gaming that is otherwise lawful under IGRA. Thank you very much. Thank you. The case just argued is submitted. Thank both counsel both for the briefing and also the argument. And we're adjourned for the morning. Thank you.
judges: Fuentes, McKeown, Bea